Good morning all. Judge Keeney, as you are now aware, is joining us telephonically. Good morning. We're ready for the first case, Kaiser v. Johnson & Johnson, Ms. Blatt. Thank you and may it please the court. My name is Lisa Blatt and I'm representing Johnson & Johnson in Ethicon. At least three errors require reversal or a new trial in this case. First, the design defect claim is preempted because federal law barred Ethicon from changing PROLIS design unilaterally. Second, both the failure to warn and design defect claims fail because ordinary pelvic surgeons know implanted vaginal mesh can cause vaginal pain and dyspareunia. And third, the FDA's clearance of PROLIFT was a safety determination. And because the court concluded to the contrary, the court triply erred in first precluding all FDA evidence, two, failing to give a rebuttable presumption instruction that Ethicon was not negligent, and three, letting punitive damages go to the jury. Excluding the FDA evidence in this case was no different than dropping a soldier in the middle of a battlefield without a weapon or even shoes. First, as to liability for the design defect, impossibility preemption arises whenever a private party cannot independently do under federal law what state law requires of it, or stated differently, when a party cannot satisfy its state law duties without asking for the federal government's permission or assistance. That was the case here. Ever since 1990, a manufacturer cannot lawfully sell a medical device without a prior FDA order that the device is substantially equivalent in terms of safety to an existing predicate device. Now, is that, Ms. Blatt, a total insulation? I mean, in other words, would that preclude any kind of challenge to the safety of the device? Of a medical device? Yeah. Well, it doesn't preclude all design defect claims because in certain of the Class I devices and even Class II devices, you don't need an FDA order. Right. It also doesn't preclude all failure to warn claims, and so you would have failure to warn claims there. And I don't think this is that different from the drug context where the courts have held that you can't bring a design defect for a drug case because obviously manufacturers just can't go on the market with a new drug without asking for FDA's permission. I just wanted to get your sense of the sweep of the 1990 Act, that's all. Well, it definitely preempts design defect claims when federal law bars you from changing the design. I mean, it's a violation of federal law. You have to ask for the FDA's permission. And so this is no different than the generic manufacturers that can't change their labels unilaterally. So all failure to warn claims are preempted in the generic manufacturing context. So I do think, though, that what's significant is if I could just go through why this case is different than in lore because that's what the courts that have ruled against us have relied on. In lore, the pre-1990 scheme, manufacturers didn't need any FDA prior permission to go on to the market. They could do so unilaterally, and they were free to change their designs unilaterally. They themselves could just make their own determination that their device was substantially equivalent to a predicate device. So there wasn't this situation where you had to go to the FDA and get prior permission. The other, obviously, the distinction in lore is it's an express preemption case. And, I mean, ever since Geier, we know that just because you don't satisfy your express preemption, you can always have impossibility preemption. So lore is just actually not on point, and the manufacturer could not have made the impossibility claim. But we have to take what lore said about the function of the 510K process and that it focuses on equivalence and not safety, so it's not really safety review. Yes, it is safety review in this case. Now, in that, in lore, I absolutely agree with you. The 510K process, given the device and the classification, it was not a safety review. So in lore, you were talking about a grandfather device. So that grandfather device, no one had looked at it for safety, period. And also, it was being, it was a class 3 device. So the pacemaker that had come onto the market was being compared and already categorized as class 3, which meant, by definition, the FDA could not assure the public of its safety. So this case is night and day, and here's why. And I think this goes to why this whole trial was infected with a massive error that somehow ProLift had never been reviewed for safety. So what happens in the class 2 category, and since 1990, you have the definition, which was not true in lore, substantial equivalence is defined in terms of safety. So substantial equivalence means a new device has the same safety profile as an existing device. What's the comparator? So the comparator, so that's point one, it has to be a safe. Two, and this is critical because this wasn't true in lore, you know in our case, the predicates were determined to be safe by FDA. And that's absolutely critical or we wouldn't have an argument about safety. So in 1988, the FDA classified all surgical mesh in class 2. So by definition, a class 2 device means it has a reasonable assurance of safety. Now that may bother you, and remember, later FDA puts all these devices in class 3 and then took them off the market. But in 1988, surgical mesh is categorized in class 2 as reasonably safe. Based on whose predicate, not yours? Based on three expert panels that were convened by statute, and those expert panels had to make recommendations to the FDA, and they found that surgical mesh had an established history of safe and effective use. Anybody's surgical mesh. Anybody's surgical mesh. So I'm about to get to the third point. So we have to win on the definition of substantial equivalence in terms of safety. Two, we had to show that the predicates were safe or found to be safe by the FDA. And then three, which we have to have, is the FDA in 2008 finds that ProLift is substantially equivalent, which by definition means in terms of safety, to previously cleared surgical mesh, i.e. no grandfather device, not some device that's out there. And let me see if I can give you an analogy that I think helps. We know the Motion Picture Association has rated Little Mermaid or Frozen a G movie. Then it comes out, Frozen 2 comes out or Little Mermaid 2 comes out, and the MPAA says this is substantially equivalent in terms of content. Now, you know it's safe to bring the kids, whether or not it's ever been rated for G. Here's what the manufacturer did in Lore. Well, I think this is critical. In Lore, it's like a movie studio. It releases a movie, and it says, hey, we're substantially equivalent to an existing movie that no one has ever looked at or rated for content, but we know it had a lot of sex in it. You don't know anything about that movie. So here you just absolutely have, you don't have the grandfather device, and you don't have an unsafe grandfather device. So I do think that those three critical steps of substantial equivalence, the courts keep saying, well, it's substantial equivalence, not safety. But they have to read the definition of substantial equivalence, and it's defined in terms of safety, which just wasn't the case in Lore. And you have the predicate acts being safe and the determination that ProLift was substantially equivalent to previously cleared surgical mesh. So what I think in Exhibit 1 to the record at 378 explains the regulatory history. So this surgical mesh material plus the toolkit was found to be substantially equivalent to just the vaginal mesh, and then that vaginal mesh was found to be substantially equivalent to just surgical mesh. So there were steps along the way, but it all traces to previously cleared Class II devices, which the FDA over and over is saying it's safe. But federal law did not prohibit your client from redesigning this implant to be safer and submitting a 510K clearance request for the safer design. Right, but that's exactly mensing and Bartlett. It assumes, and the Supreme Court goes in great detail, that state law and federal law impose a duty to make a safer product or to give safer warnings. The only question is whether you could do it unilaterally. That's all that matters for preemption is that there is a way to independently, meaning not ask for the FDA's permission. If I could just turn, because I do think we have, there is no response to the design defect, but I recognize we, for liability's sake, we need to win both design defect and failure to warn. Although I think it's an absolute, at a minimum, you have to take out the punitive damages verdict when it was based on a legal error that ProLift had no, the clearance of ProLift had no relationship to safety. But if I could just turn to the, both the failure to warn and design defect claims. Under Indiana law, this is a point that's not in dispute, the other side had to show that ProLift was unreasonably dangerous, which is defined by the statute to mean it presents for risk of harm to an extent beyond that contemplated by ordinary pelvic surgeons. And so under your case law, all that matters is that ordinary pelvic surgeons understand the fundamental nature of the injury a product can cause or the general dangers posed by the product. So what the plaintiffs had to do was point to an unknown risk that was different in kind from that they already knew. And your cases over and over and over say you don't have to know the extent or precise degree of that risk or the particular nature of that risk. And so whether or not, and what the other side is complaining about, is the surgeons didn't understand the frequency or degree of vaginal pain and dyspareunia, there's no dispute that surgeons unquestionably knew these conditions could occur, and those conditions being vaginal pain and dyspareunia. Both of their plaintiffs' experts testified that they knew ProLift could cause chronic pelvic pain. And Dr. Bales, the physician who actually implanted this medical device, testified that surgeons knew, and he in fact told Ms. Kaiser, that this device can cause long-term vaginal pain, long-term pain with intercourse, scarring, nerve damage, contraction, and inflammation. Isn't this fight really about questions of degree? Yes, and that's why it's like five cases that say you don't need to have to know the degree. Are those our cases, though, or are those Indiana cases? No, they're all yours. So there's the BB gun case, Born, that I think one of you was on the panel on. I'm sorry, the goalpost case is Born. And in the BB gun case, the parent said, well, we didn't understand the degree of harm that BB guns could talk about. And the court said, uh-uh, it doesn't work that way. As long as you know BB guns can pierce the skin, you're done. In the Born case, which is goalpost, these are all Seventh Circuit cases, and I'm about to give you five. This court is absolutely rigid on the law does not require the degree or frequency. In the goalpost case- Even when we're talking about medical devices, I think most of those cases had to do with ordinary consumer products. Well, if your kid is dead from a goalpost or dead from a BB gun, I'm not sure you care. The coffee case is a burn. It's not a medical device, but the person had severe burns, and this court said, look, if you know coffee is hot, you don't have to tell the person how many times it spills in your lap or how severe the burn is. Right, understood. Ordinary consumer products differ in kind, and the risks differ in kind and degree from medical devices and pharmaceuticals, and we're in the world of medical devices and pharmaceuticals in this case. I think that's a fair point. Let me get directly to that. I feel for Ms. Kaiser, I feel for all patients, and they can sue their doctor if they don't think the doctor explained to them the risk of the medical procedures, but a manufacturer's duty as a maker of a product, their consumers are physicians. They don't owe a duty. I know that's unfortunate, and, you know, that's just your law. It is unfortunate that manufacturers don't have a one-to-one relationship with patients, but the doctor's responsibility was to tell Ms. Kaiser whether or not to implant this and to form an opinion, and nothing stopped her from suing her doctor. But when it comes to the manufacturer, the duty runs to sophisticated surgeons, sophisticated surgeons implanting a device into someone's vagina, the notion that they did not know, and they all testified that they did know, that this could cause pain, and it could cause pain when you're using your vagina to have sex. It's fanciful that you would say, okay, fine, there's a special duty now with medical devices that you have to tell surgeons in a way that maybe they would give them a how-to-talk-to-your-patients kind of questionnaire or pamphlet. So I hope you don't take your case law into a direction that sort of changes the notion of the learned intermediary doctrine where drug manufacturers, device manufacturers, have always had a duty to run to very sophisticated professionals who, in turn, have, you know, pretty strict duties on how they're supposed to talk to their patients. Why didn't the surgeon testify in this case live? It's a good question. Neither side decided that that was worth the risk. Because he was so equivocal in his definition. It may be because he was equivocal on causation, but what he was not equivocal, and I think you may be right, although I don't know. But he testified on sort of both sides of the causation divide here. There's testimony supporting both sides. I think that's fair, but there's no testimony, no testimony whatsoever, and I would be shocked if a surgeon could say, sure, I do pelvic floor surgery, but who knew it caused vaginal pain? Who knew? He said the opposite. Of course I know. Their own experts say, yeah, obviously, implanting a foreign body device can cause kind of scarring and inflammation and all kinds of problems, and we know it can lead to chronic pain. And he doesn't say, oh, no, I didn't know that. So the other side is going to say, well, he didn't know all the risks. Okay, well, I hope you asked him. What didn't he know? He's going to have to say, well, I knew it would hurt in that body part, but the doctor just didn't appreciate how much. And I really think then you're going to have, I mean, again, I'd cite the five cases on the goalpost, the BB gun, the coffee. I think there was a helicopter blade. There's a lot of cases that are talking about, you know, interpreting the very statute at issue in this case is that you don't have to, the product is not unreasonably dangerous as long as they know the general danger or the fundamental nature of the injury. And so I think you would just have to say, well, maybe there's a special exception for doctors, because somehow doctors maybe aren't as sophisticated as we thought they were. But no matter what on liability, if you think that the liability verdict, I just don't understand how anyone could in good conscience uphold a punitive damage award of $10 million when the jury never saw the elephant in the room or even heard it. Instead of hearing that the FDA looked at this device, they heard nothing. They heard a one-sided fiction that Ethicon could have cared less about women, that they had willy-nilly marketed. And this goes to the exclusions of 501K process evidence. Exclusion of all FDA evidence. Right, which was a blanket exclusion pretrial here. And we would be running upstream against other circuits and reversing on that ground and ordering a new trial, as I understand that the Fourth and the Eleventh Circuit have said that's fine to blanketly exclude this evidence. Yeah, so let me address it. The Eleventh Circuit drops a footnote and said, I think it was Boston Scientific, you made your arguments too late. So the Eleventh Circuit just doesn't address the arguments we're making about the distinctions in lore, that there's not a grandfather device. Now, you're right about the Fourth Circuit. The Fourth Circuit has excluded this evidence in punitive damages cases. However, if you say this evidence was there was a legal error here, I don't think you'll create a conflict because you have two state statutes that are showing they care about compliance. Indiana law, this is just not true in any of the Fourth Circuit cases. Indiana law says if you comply with FDA's rule, you get a rebuttable instruction. That's just a plain legal error that's not even an issue in that Fourth Circuit case. New Jersey law just bars punitive damages. Now, I appreciate that they have trial courts that have gone the other way. They're on appeal. But you would be the first court to say when you have Indiana and New Jersey actually try to protect defendants in these various situations, and one of them, you get to tell the jury that there's no liability. And in the New Jersey state, it's just because all these drug manufacturers and drug devices are in the state. This is a protectionist statute to protect this defendant. And they didn't even get to defend themselves with the evidence. So I just think you're free and clear on the Fourth Circuit as a matter of a pure circuit split. Indiana law is peculiar on product liability cases. It's all statutory, although it preserves common law remedies. So you can have a negligence claim running parallel with a statutory claim, as I understand the law, even though we've said otherwise. I think that's wrong under state law. But the statutory claim for a product liability action requires both proof of defective, a defective and unreasonably dangerous product, and negligence. So it almost sets a higher hurdle, it seems, than a normal 402A strict products liability claim at common law. Most of the states, but not all of them, follow what sort of your law and economics approach. I don't know if that's not a nice thing to say. I get that in this context. That's the fight about the state and third. No, but I just think your cases, more than any other circuits that I've seen, are very law and economics driven about how negligence really does require an expert testimony on how you could have had an alternative safer design. You've just talked about that over and over and over in, I don't know, maybe four or five cases, and three of them have been post the TRW case. So your case law, the way I read it, and the way anyone, I think, has to read it, is you have to have expert testimony that there was a safer design that would have prevented the injury. But the Indiana Supreme Court has said precisely the opposite. And this is another area where I think our cases misread or are out in front of the Indiana Supreme Court, which has said we don't follow the restatement third on the requirement of an alternative safer design. It's just pure negligence. Well, so we have a distinction that that in a footnote just referred it to elements, and so it's still a requirement. But if you disagree, so I'm hearing you say, I get it, that I just don't agree with you, but you have three panel decisions that have definitively construed Indiana law. You've had no intervening circuit precedent. Yeah, we can't definitively construe Indiana law. We just predict. Yeah, but if you have a different panel, predict Indiana law differently each time, it makes it very difficult to try cases in this circuit because you have three cases unanimously saying Indiana law requires a safer alternative. And Judge Sykes, even if you think it doesn't require a safer alternative in every single case, it sure should require it in a medical device case when a manufacturer puts a product on the market that's helping millions and millions and millions of women with a very serious medical condition. And so you know there's social utility. And so the question is, it's not like this was some sort of, you know, a toy gun with poison at the end, and you're kind of thinking, really, why'd you put the poison at the end? I mean, this was a medical device, and so the notion that, you know, could it have been made safer? Now, we know today the FDA doesn't seem to think so, at least with respect to transvaginal meshes. They took them all off the market. But to say that's negligent and sort of to say, well, okay, we can't win on preemption. We can't win on negligence. We can't even introduce the evidence. It is a very strange system of justice that makes a defendant subject to the jury imposed $25 million in damages because they thought Ethicon was wantonly profiting from inserting products into women's vaginas without studying them, without, you know, just kind of careless. Yeah, this seems like a good idea. When they had spent years and years dealing with the FDA, the FDA had called it safe. The jury may not have liked that. They may not have liked the FDA's safety determination, but they didn't even get to tell their side of the story. And remember, even with both hands behind their back, the trial judge said this was a close case. Is this the highest verdict in any of these cases from the FDA? No, I don't think so. No. No, you have, well, I guess the $25 million. The original verdict. Yeah, the original verdict. There may have been one for $35 million. I hate to be quoted if it's not that high, but I think in some of them you have more severe injuries, more repeated surgeries, some, you know, also just different facts. But I think the liability evidence is generally the same, and no case has Ethicon put on evidence of its determination, I mean its dealings with the FDA and a jury awarded punitive damages. That's uniformly been excluded? Because it's uniformly been excluded. As to all these cases that have gone to trial so far. In state court in Pennsylvania and in New Jersey, and I think the, I don't know if they've got a western district, but, yeah, the Fourth Circuit has ruled against us, but you read it and it says, okay, this is not probative of safety, and they just stop. Well, it's not probative because of some 1990 case dealing with a riskier product in a different statute. I've never seen a court case like that that says, well, it's just equivalence, not safety, even though equivalence is defined by safety. You have to at least read their analysis before you decide to agree with them. Under the amended act. Yeah. The 1990. Yeah, and at risk of sounding, you know, I think you've got to read their cases and agree with them before you side with them, and I think some of these cases are just saying, well, the path of least resistance is just to go with the flow. But the statute could not be more clear that it says substantial equivalence means it has the exact same design characteristics, which is a harder threshold to meet, or it doesn't present different risks of safety and efficacy from the predicate device. Is it fair to say that under the federal regulatory structure, once a medical device, a particular kind of medical device is classified, everything else to come on the market after that is in that basket for a 501K review, unless there's some catastrophic flow of injuries that would prompt a reclassification? So, yeah, I think you can. I mean, this got in 2016, all transvaginal mesh was reclassified into class three. So the FDA was looking at it. But let's talk about what's in class two, surgical mask and wheelchairs. So I get that your instinct is what is a vaginal mesh doing in class two? But it's like that because of the fact that it was the same as the polypropylene in sutures. So the FDA decided, hey, it's been forever since, I don't know, 1930s, it's been for hernia repair. It's the same material that's being used for vaginal use. And that was cleared in 2002. Jury never heard that. But that 2002 FDA decided it had the same safety profile. And I don't think, you know, well, I know from preemption, juries aren't allowed to just say, well, we disagree with that and somehow Ethicon should have violated federal law. Now, they're going to get up here and say, well, Ethicon went on to the market without asking for FDA's permission. Yeah, and they were told, uh-uh, you can't do that because you had a change in design. You have to get our permission. So they made Ethicon go through this. You know, they submitted 300 pages in massive data. They don't like that it wasn't clinical data. I mean, the plaintiffs definitely don't like the FDA's medical device scheme, but that is the medical device scheme that we have. And that's why we have preemption. The facts in Mensing and Bartlett were pretty bad. I mean, they were really bad. But the FDA said, you know, it approved the label, and it was just a question of whether you could unilaterally change the label. These were five-four cases, so I get that there is an alternative view. But it's still straightforward preemption on possibility preemption. I'm not going to cut you off. No, rebuttal? It's your time. Sorry, no, I didn't know. I'd like to save the remaining for rebuttal. You reserved five minutes, so we're a little bit into the five minutes. OK, I'm sitting down. OK, thank you. Thank you. Mr. Miller. Good morning, Your Honor. May it please the court. My name is Mark Miller, and I represent the plaintiff appellate, I'm sorry, plaintiff appellee Barbara Kaiser in this case. This court should affirm the verdict below, which is based upon the jury's hearing of all of the evidence in the case, including evidence that Ethicon's dangerous pro-lift device caused Mrs. Kaiser's permanent injuries and constant pain. It ruined her life. To obtain judgment as a matter of law, as defense counsel indicated, they have to win on both arguments. They have to win on design defect and on failure to warn. I'd like to start with failure to warn, because if the court agrees with us on this straightforward issue, then the court doesn't need to get into the legal issues of design defect, preemption, and safer alternative design under Indiana law. Counsel, this is Judge Kainey. Could you tell me how the accident impacted on this damages? That is, all of the accidents causing the crushing of the mesh? Sure, Your Honor.  This is Judge Kainey at page 662 to 663 of the record. Dr. Rosenzweig testified that the characteristic of the mesh that caused it to deform, contract, and bunch caused Mrs. Kaiser permanent pelvic pain, permanent vaginal pain, permanent dyspareunia, which is pain with intercourse, painful bladder spasms, and she had to go through a subsequent revision surgery where part of the mesh was removed, but not all of it could be removed. But she didn't suffer these symptoms prior to the accident? No, Your Honor. She had urinary problems before the accident, but all of these injuries were linked to the mesh device itself. The defendant doesn't argue, as far as I know, that there's any causation problem between the device itself and her related injuries. Thank you. As I was saying, I plan to start with the failure to warn argument. They only raised two arguments under failure to warn. In both of these arguments are issues of fact that are left within the province of the jury to decide. First, were the prolifes warnings adequate as a matter of law? No. Second, was there any evidence that Dr. Bales would have changed his conduct with regard to Ms. Kaiser's treatment had he been provided a stronger warning? Absolutely. Starting with that second, that causation argument, this is almost always a jury question. Causation on failure to warn is almost always a jury question. Under Indiana law, there's a heeding presumption that if a heightened warning is given, that a treating physician will abide by that warning and alter his conduct accordingly. But under Indiana law, a plaintiff need not submit testimony that conclusively establishes that the doctor would not have used the device or would not have prescribed the drug if there is an issue of fact that the jury can base its ruling on. We cite to the Tucker case for that. Here, Dr. Bales clearly testified that had he been aware of the potential problems that occurred with the prolif device, he would have never started using the device in the first place. And if that weren't enough, he testified that once he learned about how patients fared and how complications occurred, he stopped using the device. And those complications that he was referring to include chronic pelvic pain and contraction. We cite to docket number 395, pages 125 to 126 and 133 to 134. So there's evidence here that Dr. Bales would have changed his treating decision with regard to Ms. Kaiser. At best, they've pointed to testimony that they believe contradicts that testimony that the plaintiff submitted, but that is just an issue of fact. With regard to the adequacy of the warnings, again, adequacy is almost always a jury question. Here we had two experts, Dr. Elliott from the Mayo Clinic and Dr. Rosenzweig from Rush, testify that the nature of the complications and the risk involved with the prolif device were not known by the medical community, were known to Ethicon, and were not contained in the warnings with the product. I'll point to pages 35 to 40 of our brief where we list many different warnings that were missing, but just to supplement that, Dr. Elliott testified that the significance of mesh shrinkage and contraction was not known about to the medical community. The nature, the intensity, the severity of contraction and how it results in injuries to a woman with a mesh implant were not known. Likewise, Dr. Rosenzweig testified that contraction and inflammation leads to nerve damage and vaginal hardening. The contraction at issue here is what resulted in Ms. Kaiser's injury. Dr. Bales himself testified that he wasn't aware of chronic pain and contraction at the time, and learning of the high risk of chronic pain and contraction led him to stop using the device. Defendants want to point to the monograph, and I'll talk about the monograph in a second, but if the court looks at the IFU and its Plaintiff's Exhibit 1005, there is not a single mention of the type of pain or the nature of the pain that the plaintiff incurred in this case. The only mention of pain is the transient leg pain, short-term leg pain. That's not what we're dealing with here. There's no mention of chronic pelvic, vaginal, and groin pain. There's no mention of dyspareunia at all, which is pain with intercourse. While they make a passing reference to contraction, and they actually refer to it as being the same as seen with any implanted medical device, they don't talk about how contraction in this situation leads to permanent lifelong injuries. Ethicon's argument is that as long as the general type of injury is known, pain, then they don't have to talk about the nature and the extent of the injury. But that's directly contradicted by the IPLA language itself, and also the case law that we cite to in our brief. Under the IPLA, a product is unreasonably dangerous when it poses risk of physical harm to an extent beyond, quote, to an extent beyond what's anticipated by the consumer. So the extent of the risk, the nature of the risk, the frequency of the risk, the severity of the complications is built into the statute itself. Likewise, with regard to what warnings need to be included within the packaging and the labeling of the product, the IPLA just says reasonable warnings of the dangers. It's a pure negligence standard. And in order for a jury to determine what was reasonable under the circumstance, they should look to the actual results of these complications, the actual nature of these risks. We cite to the Runge case where the court held that an issue of fact existed because the physician in that case was not aware of the, quote,  This is exactly what we have here. Ethicon points to a couple pieces of testimony about how the general nature of the risks were known to people in the medical community. But again, that's at best an issue of fact. And their primary argument relies on the monograph. And if I could just for a second mention the monograph. As I said, the IPLA requires the warnings, this court's analysis of the warnings, to focus on the packaging and labeling with the product. And that's section 34-20-4-2. The monograph is not the packaging. It's not the labeling. It's a separate document that Ethicon wants this court to now look at. But I'll say with regard to the monograph, even what's discussed in the monograph, now they talk about dyspareunia, but they also say that the rates are low. They talk about the fact that vaginal pain rarely occurs. So the monograph itself doesn't exactly inform the medical community of the true nature of the risks involved with this product. But even if it did, this court's analysis shouldn't reach to the monograph, especially when there is no expert testimony that everything that's contained in the monograph is common knowledge of the medical community, that it's known and understood by doctors like Dr. Bales. Moving on to design defect. Their preemption arguments fail because the United States Supreme Court has specifically reviewed the 510K regulatory process and said there is no preemption, and their arguments relating to safer alternative design under Indiana law fail because the Indiana Supreme Court has specifically said there is no requirement for safer alternative design. With regard to preemption, no court has ever found that the 510K process preempts state law. In fact, in lore, the Supreme Court said that it was Congress's intent for the 510K process to maintain the status quo, which included the possibility for state tort law liability for 510K cleared devices. The Supreme Court's preemption ruling in lore was broad. The Supreme Court held that the 510K process is not focused on safety. It doesn't include any device-specific or product-specific safety requirements, and it doesn't constitute a determination of safety by the FDA. That was a pre-1990 state-of-the-law ruling. It had to do with the grandfathering and the substantial equivalence 510K process as it existed before the 1990 amendments? Lore came down in 1996. The SMDA changes were in 1990. Lore was six years after the SMDA process. Which law was it reviewing? The FDA... I'm sorry. The Supreme Court ruled the 510K process in general in lore. The Supreme Court specifically mentioned the changes made by the SMDA, but it didn't draw any distinction based upon pre-SMDA or post-SMDA. The Supreme Court in lore just reviewed the 510K process as it existed, and I'll point out that... The product in question had been cleared under 510K under the pre-1990 law. The product in question was found to be substantially equivalent to a grandfathered device. All right, so it's not a post-1990 ruling about the nature of the 510K process. Well, lore is post-1990. I'm saying decision post-date, so I think you get what I'm driving at. The product at issue was not a post-1990 product, but either way... It had not undergone any safety review, nor had its comparator. Post-1990, all comparators undergo a full safety review. That's a necessary predicate for 510K clearance, right? The product at issue in lore was a Class III device, so I believe that that product did actually go through a safety review, unlike the predicate devices here, because 510K is not a safety review. So when Ethicon tries to claim that they have substantial equivalence to a predicate device that also went through the 510K process, that predicate device did not have a safety determination by the FDA. Actually, if you look at the... How did the predicate device access the market? Well, the predicate devices for the ProLift are the UltraPro mesh and two pelvic organ ProLap kits made by a competitor of Ethicon, American Medical Systems. All of those products went through the 510K process based upon the claim that they were substantially equivalent to another product that went through the 510K process, and another product that went through the 510K process. So if you want to actually look at the family tree for the ProLift device to get back to a product that was reviewed by the FDA for safety, you do have to go back to proline sutures, stitches that you might have in your arm. And for that reason, the Supreme Court in Laura said substantial equivalence is not a safety determination. It's akin to a game of telephone that children might play, where the product at issue back in the 30s starts out one thing, and then all along the line, changes are made. And at the end of the day, in 2007, when Ethicon asked for 510K for the ProLift device, it's a completely different device. So it's really just a loose classification decision is what it is? It is. It is, Your Honor. And counsel argue about how the panel itself classifies devices as Class II devices. No court has ever said that the classification by the panel is a safety determination. The statute itself doesn't say that the classification is a safety determination. And the classification as a Class II device doesn't make sense as a safety determination, because if the 510K review process that the product qualifies for based upon this determination of class is not a safety review, then the classification itself isn't. And I'll also point out that classification as a Class II device doesn't necessarily even require a 510K review. If it's a nonsubstantial change to the device, or if it's a device that doesn't need to go through the 510K process, then just the classification as a Class II device should not be a safety determination when there's actually no review of a specific product at issue. And the panel's determination did not review ProLift specifically, but just reviewed vaginal mesh devices. Epicon argues that under Lohr, the conflict preemption argument that they make here wasn't reached. But if you look at the underlying briefing in Lohr, Medtronic argued that they could not both comply with state law and the FDA 510K process. They argued preemption. And I'll point to 1996 U.S. Supreme Court briefs, Lexis 132 at 27 to 28 and 70 to 71. The majority's opinion in Lohr also dealt with conflict preemption with regard to manufacturing defect and labeling defect. And Justice Breyer's concurrence said that for the same reason there was no express preemption for the design defect claim, there's also no conflict preemption for the design defect claim. So it can't be argued that Lohr didn't consider design defect in conflict preemption. Moving on to their discussion of the drug cases, one of the drug cases that they point to, mensing, actually says, look, each FDA regulation brings with it its own conflict preemption and idiosyncrasies. And a generic analysis cannot be crafted that could be applied to all of the different FDA regulations. So where this court, I'm sorry, not this court, but the Supreme Court has looked at the 510K process under Lohr, this court shouldn't look to other decisions relating to other FDA regulations to determine if preemption applies. But even if the court does, Wyeth and mensing and Bartlett show why there should be no conflict preemption here. In Wyeth, the court said that because the changes being affected clause provided a pathway for the brand name manufacturer to effectuate a change to the product, there was no conflict preemption unless and until the manufacturer could show through clear evidence that the FDA would have rejected that proposed change. Here, it's clearly possible for Ethicon to go through the 510K process and effectuate a change to the ProLift device. They never tried to, so there's no clear evidence that the FDA would have rejected that change. But for the same reasoning in Wyeth, there's no preemption here. Defendants want to argue that the FDA has to be completely written out of the process, but the FDA wasn't written out of the process in Wyeth. Under the CVE clause, the brand name drug manufacturer needed to submit its changes to the FDA, the FDA would review it, and then it would either approve or reject those changes. So the fact that the FDA has some review process for 510K doesn't equal conflict preemption. And if you look to mensing, that becomes more obvious, because the generic drug manufacturers in mensing had no option. They were in the impossible position where they couldn't comply with state law and they couldn't make any changes to the warnings of the device. The court focuses on avenues, and the court uses that word avenue. The court said there are no avenues by which the generic drug manufacturer could proceed in order to obtain different labeling for the drug ad issue. When the court talked about unilateral conduct, the court was talking about the argument that the generic drug manufacturer could have petitioned the FDA and asked the FDA to intervene on its behalf to convince the brand name drug manufacturer to change its own labeling, which would then allow the generic drug manufacturer to change its labeling. And that's a situation where the court said, no, that's not unilateral conduct. That requires the special assistance and special permission of the FDA. It's something outside of the normal regulatory pathway. And why if there was also FDA approval for the change, but that was through the normal regulatory pathway, the CVE clause, which is exactly what we have here. The 510K process allows for the change to be made without some sort of discretionary decision by the FDA on whether to take actions with regard to a third party like there was in Mensa. Can we talk about the exclusion of the 510K evidence? Sure. Does that just relate to the design defect claim, or did that evidence also infect the jury's consideration of the failure to warn claim? The quick answer to that is that defendants only sought to have the FDA 510K evidence admitted for design defect and to support the jury instruction. So they've never made any argument that this FDA evidence should support, would relate to the failure to warn claim. They've also argued... Well, what do you mean to support the jury instructions? The jury instructions on what? The jury instruction on, under the IPOA, a rebuttable presumption... On the presumption. Yes, on the regulatory compliance presumption. On the state-of-the-art and the regulatory compliant, not the state-of-the-art instruction, but the regulatory compliance instruction. Yes, the entire argument that they make on regulatory compliance instruction has to do with their compliance with the FDA 510K process. With regard to the 510K process and the admissibility of evidence, no court has ever held that it's an abuse of discretion for a trial court to exclude FDA 510K evidence. As the court pointed out, the Fourth Circuit in Sisson and Husky, and the Eleventh Circuit in Egniam, have held that it excludes evidence. The vast majority of trial courts also exclude this evidence. The fact that defendants can point to a couple of decisions where the trial court has admitted FDA 510K evidence is irrelevant here. We don't argue that it would be an abuse of discretion for the court to have admitted this evidence in this situation. That's not the question that's before the court. What's before the court is whether or not it was an abuse of discretion for Judge Simon to exclude it. No court has ever found that. It's clearly within the analysis of Rule 403B for Judge Simon to look at the hundreds of pages of expert reports, the decades of regulatory history, and look at that in relation to the Supreme Court's holding that this is not a safety determination. It's more prejudicial. It would confuse the jury. It would cause a mini-trial. Isn't it necessary to have that background information about the regulatory environment and regulatory compliance in order to determine what a reasonable manufacturer of this medical device would do? No, because it's not a safety determination. It's not focused on safety, and it doesn't provide any sort of determination of safety. So whether or not they followed the 510K regulatory process doesn't have anything to do with whether or not the device was unreasonably dangerous under Indiana law. With regard to the exclusion of FDA evidence and Indiana law, I'll point out that there is an even higher bar that the defendants have to meet in this case, because under Indiana law, and we cite to the Wade v. Turek-Telalec case, the Indiana appellate court said that because the regulation at issue in that case did not deal with the specific design defect claimed in that case, compliance with the regulatory process not only didn't justify an instruction, but also was not admissible in the first place. The appellate court excluded evidence of compliance with a regulation that did not deal with the specific design defect in this case. Here, there can be no argument that the 510K process deals with the specific defect at issue in this case. The Supreme Court said in lore that there are no product-specific requirements under the 510K process. Do the Indiana appellate courts interpret that statute that provides for the rebuttable presumption to cover only compliance with safety regulations or compliance with other regulations? It seems like the statute on its face has two parts. One is directed at compliance with safety regulations, and the other is broader. Well, if you look at the case law interpreting that statute, it seems clear that it's dealing with safety regulations, because in the Wade case... Are they interpreting sub-1 or sub-2? I'm sorry? Are those decisions interpreting sub-1 or sub-2 of 3425-1? I believe sub-2, because sub-1 is the state-of-the-art. The case that I'm referring to is the Wade decision, dealing with regulatory compliance, and in that case, the court said that the regulation with which the defendant complied had to relate to the specific defect at issue. So the Indiana courts have glossed the statutory text with this requirement that the code compliance in question has to deal with safety standards, given the context of the statute, which is... The statute doesn't say safety standards, and the case law doesn't actually say safety standards, but it deals with specifications and requirements specifically relating to the defect at issue. So if there is a non-safety standard that does relate to the defect at issue, then I suppose that a rebuttable presumption would be applicable in that case. With regard to their grandfathered argument, they're arguing that the route or the pathway with which a product qualifies for a 510-K exemption, and I'll point out that the Supreme Court in Regal said it's an exemption, it's not a requirement, but the route in which the product qualifies for this exemption is what really matters. But the truth is, in Lower Earth, the court made no distinction between grandfathered devices and non-grandfathered devices. In one part, the court actually says grandfathered devices and other 510-K or other Class II devices. So there's no actual distinction, and no court has ever drawn a distinction based upon this grandfathered issue. Regardless of how a product qualifies for the 510-K review process, it's still a substantial equivalent review. The process doesn't change one bit depending on how the underlying product qualified for the exemption. Does the failure to warn causation case rest on Dr. Bales' testimony where he said in general terms that he wasn't as appraised of all the possible risks and subsequent problems as he would have liked to have been, and that it's fair to say that in hindsight, had he seen the potential problems that occurred, he may not have started using the ProLift. Is that what it hinges on? There's several pieces of testimony that we point to from Dr. Bales. But yes, he did. He specifically testified that he was not aware of the risk of chronic pain and contraction. So these are types of risks. It's not just as defendants want to paint it. He didn't understand the true severity of the risk. He also testified that he wasn't aware of the high risk of chronic pain. But as to causation, is the finer point of my question. Yes, I'm sorry. That deals with the causation issue. Well, right. Obviously, what he knew based on the warning and what he didn't know based on the warning deals with causation. But ultimately, the question of ultimate fact that the jury has to decide is whether he would have done anything different had he known of the extent or degree of the risk. Yes, the nature and extent. This is a fight about degree, right? It's a fight about degree to the nature and the extent of the risk. As to the warnings claim, anyway. Yes. Well, actually, their argument for unreasonably dangerous under-designed defect also overlaps this issue a little bit. Because they argue that it cannot be unreasonably dangerous if the normal consumer, a physician in this case, understood the risks. So it does overlap design defect a little bit. But as far as what Dr. Bales knew, that deals with failure to warn causation. Right, but there's the bottom line question about whether he would have stopped using this device or not used it at all to begin with had he known. Is that the key passage of his testimony that the whole causation case rests on? That is the testimony that we cite to on payoff. 395 at 119 and 395 at 125 and 134 is the testimony that we cite to with regard to causation. Is that what I just read? I don't have the citations written down. Yes, it is. It's what you're referring to. Was there more than that I guess is what I'm driving at? There's not more than that that we haven't cited in our brief. The district courts recognize that there is an issue of fact here in the district. But the district court said that this is competent testimony from an experienced surgeon that the jury could look at and say, look, under Indiana law, the treated physician doesn't have to conclusively say that he would never have used the device or that he would not have used the device in disguiser as long as the jury can look at that testimony and make a decision on its own that the heightened warning would have changed his treating decision. With regard to safer alternative design, the court's well aware of the TRW decision. I don't want to get into it. What I would like to point out is that there are three cases that this court has decided since TRW, Lapsley, Argood, and Pilch. And in not one of those cases, if you look at the underlying briefing and the underlying decisions, did any party argue that safer alternative design was not required under Indiana law? So the issue really wasn't before this court in any of these three decisions. And even if it was, this court is bound to follow Indiana Supreme Court precedent on an issue of Indiana substantive law. I just wanted to address, I see my time is very short, but I just wanted to address the damages question that the court raised. There have actually, since we filed our brief, there have been two subsequent jury verdicts. One dealing with ProLift, where the jury awarded $30 million to the plaintiff in compensatory damages and $50 million to the plaintiff in punitive damages. And there was another jury dealing with the TVTO device, a transnational mess sling device, where the jury awarded $20 million to the plaintiff in compensatory damages and $100 million to the plaintiff in punitive damages. Ms. Kaiser's damages awards were well within the range of, I see I'm out of time. Are you talking about the compensatory award or the punitive award? Both, both, Your Honor. Because for compensatory awards, we don't do a comparison under Indiana law. Well, I think both of the parties agree that for compensatory damages, the court can look to comparable cases to determine whether or not the compensatory damages award was monstrously excessive. Well, right, but that's the federal standard and the monstrously excessive standard isn't a standard at all. It's just a descriptive term that the case is used and it's somehow morphed into a standard for federal damages claims, which is long overdue for correction. But this is a state law case and Indiana damages law, which is the substantive law of this case and the substantive standard in the Indiana courts doesn't require a comparison. If no comparison is necessary, then I would just point out that the jury heard all of the evidence in this case and this court should give deference to the jury who was able to make a determination on credibility. And that's generally what the Indiana courts say. Thank you, Ms. Miller. Ms. Black? Thank you, and may it please the court. If I could start with the Indiana presumption. Judge Sykes, why it's relevant to both design defect and failure to warn is the presumption goes to both claims. So the jury's entitled to find that Ethicom was not negligent if there was a compliance with FDA rules. Are warnings as well? Because there isn't a... It just goes to negligence. So you can find not negligent, whatever the theory is. But isn't that key to the theory of the claim? Well, it's... Under the statute. The pattern jury instructions are simply, are you negligent? But in any event, it also goes to punitives. So we want that evidence in there because in a new trial, the jury has got to be able to hear this before they award punitives. So even if there's liability on failure to warn, it would go to punitives. And that's consistent under the New Jersey standard for punitives, which I guess everybody... New Jersey, it's just foreclosed if it's a generally recognized as safe medical device. It's just you cannot get punitive damages. Period. On that issue of the... Just quickly on the Wade case. So I do think that there is a connection and it has to be relating to... It has to be a safety standard. The other side is correct. But in Wade, there was no overall agency looking at the product as a whole. So here you had the FDA making a... It provides reasonable assurance of safety and it looked at the precise feature and design and declared them safe that they declared as unsafe. They don't actually tell you what was defective about this, but they looked at the type of mesh and looked at the design and said it was safe. On safety, if we could turn to that, because I really think that's critical for there to be a new trial. It's a straight legal error since the court said it's not probative of safety. Period. It has no relevance. It is insulting, frankly, to say that Lohr governs this case because the case came in 1996. It was a 1982 substantial equivalence determination and it was a class three device that had never been... Had gone through any pre-market approval or any safety review other than to determine that it was so inherently unsafe it needed pre-market review. Here on the class two device, FDA classified this device, not expert panels. Expert panels made recommendations to FDA and it was FDA, a federal agency, who in 1988 classified it in class two. It's a statute. The statute says if it's class two, it's safe. They can, as loud as they want, keep saying it's not safe, but they don't actually talk about the statute and the statute says class two means it's safe. Substantial equivalence is defined in terms of safety and in 1996 and in 2002 and in 1988, you have the FDA repeatedly saying that the predicates for ProLift were substantially equivalent in terms of safety as predicate devices we determined to be safe. Safe, safe, safe is all over the administrative record. On the failure to warn, it's pretty critical. The other side got up and talked about failure to warn. I'm talking about unreasonably dangerous because it kills both claims. I understand it doesn't help me to talk about failure to warn. I get rid of both claims if I can show under your five cases that it's not unreasonably dangerous because any vaginal surgeon knows implanting something in one's vagina might cause vaginal pain and the testimony is absolutely clear on that. It's true that the doctor says I didn't know the nature and degree. It's true your statute. The statute says extent. It's also true that this court on three separate occasions has cited that very statute and said you do not need to understand the extent or specific degree of the pain or the particular degree that a known risk. This is under the consumer contemplation component of the unreasonably dangerous test with the relevant consumer clasping surgeons. Yes. The pelvic floor surgeons who are supposed to understand. The monograph, again, even if it doesn't go to failure to warn, it goes to what an ordinary surgeon and a surgeon reads a manual before presumably he implants and if he doesn't, again, they could have brought a medical malpractice claim against the surgeon. And the surgeon presumably knows about the regulatory background? I hope so. Was that the subject of testimony in this case? No. Because it was barred? It was barred. I don't think they ever asked is it a class two and frankly I've never asked a surgeon about the classification. I have asked about drugs, though. Thank you. Thank you, Ms. Blight. Thanks to both counsel. Thanks to all counsel. The case is taken under advisement.